IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 12-000182-01-CR-W-BP |
| CHARLES F. MILLER, JR., | |
| Defendant. | |

**PLEA AGREEMENT**

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the parties described below have entered into the following plea agreement:

1. **The Parties.** The parties to this agreement are the United States Attorney's Office for the Western District of Missouri (otherwise referred to as "the Government" or "the United States"), represented by Tammy Dickinson, United States Attorney, and Charles E. Ambrose, Jr., Assistant United States Attorney, and the defendant, CHARLES F. MILLER, JR. ("the defendant"), represented by Stephen C. Moss.

The defendant understands and agrees that this plea agreement is only between him and the United States Attorney for the Western District of Missouri, and that it does not bind any other federal, state, or local prosecution authority or any other government agency, unless otherwise specified in this agreement.

2. **Defendant's Guilty Plea.** The defendant agrees to and hereby does plead guilty to the single-count Indictment returned on June 14, 2012, charging the defendant with a violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846, that is, an attempt to possess, with intent to distribute, more than fifty (50) grams (actual) of methamphetamine. By entering into this plea agreement,

the defendant admits that he knowingly committed this offense, and is in fact guilty of this offense.

      **3.**   **Factual Basis for Guilty Plea.**   The parties agree that the facts constituting the offenses to which the defendant is pleading guilty are as follows:

      On May 29, 2012, a confidential witness (CW) contacted the Linn County, Kansas Sheriff's Department after he was introduced to an unknown white male, known only to the CW as "Charlie Miller." Miller told the CW that he wanted to do something to a methamphetamine dealer (the "intended victim") in Kansas City. The CW was not clear at that point what Charlie Miller wanted to do, which was why he contacted the Linn County Sheriff's Department. The CW knew that Charlie Miller did want to take three to four ounces of methamphetamine and cash from the intended victim. Later the same day, Deputies from the Linn County Sheriff's Department sent the CW back to meet with Charlie Miller to consensually record a conversation about what Miller was planning to do to the intended victim. A review of the recording corroborates the CW's reporting that Miller wanted to steal three to four ounces of methamphetamine (which Miller described as "fire-ass shit", meaning high-quality methamphetamine); cash; and any other drugs in the intended victim's possession.

      On June 7, 2012, at 5:14 p.m., the CW telephonically contacted Miller. This call was recorded in the presence of law enforcement. The CW told Miller that he was almost there, and Miller asked if the CW remembered how to get there (a storage unit on I-70 in Kansas City where Miller was waiting). The CW reminded the CW that it was Exit 18 [off of Interstate 70], and to call Miller when he got there so that Miller could open the storage facility's gate. The CW was equipped with an audio transmitter and a body recorder. The vehicle that the CW was driving was equipped to record both audio and video of the interior of the vehicle. The CW's vehicle was also searched, noting that the only items of evidentiary value were a dark shirt and pants that the CW brought with him for a "disguise." Photographs of that clothing were taken prior to the CW departing the meeting location. No other items of evidentiary value were located inside the vehicle. The CW was also searched, noting that there were no items of evidentiary value in the CW's possession. The CW then departed for the storage facility, and was observed by law enforcement officers conducting physical surveillance continuously until Miller was arrested, as described further below.

      The CW arrived at the storage facility at 6:19 p.m., and was overheard making an outgoing phone call, saying that he was there. Officers conducting surveillance then observed a white male with no shirt open the gate to the storage facility and then get in the passenger side of the CW's vehicle, which was then observed driving toward the storage units. While the CW and Miller were inside the storage unit, officers overheard portions of the conversation between the CW and Miller. Miller told the CW that they would look for the intended victim at his house, and Miller described a specific area of the Kansas City, Missouri, Metropolitan Area where the intended victim's house was located. Based upon that information, officers loaded the intended victim's name into the CLEAR subscription database which, among other things, provides historical addresses associated with people. The first address that was associated with the intended victim matched the location description that Miller had described.

At 6:43 p.m., officers observed the CW's vehicle departing the storage facility and traveling westbound on Interstate 70. The CW and Miller could be heard inside the vehicle, continuing their conversation. Miller gave directions to the CW, telling him where to drive. The vehicle was observed travelling directly to the intended victim's house that was identified in the search of the CLEAR database. Approximately one minute prior to arriving at that house, Miller was overheard saying something about a drive-by of the house, indicating to the officers conducting surveillance that Miller wanted to see if the intended victim's vehicle was located at the residence. After passing the residence, officers overheard Miller state that the intended victim was not there.

The CW's vehicle was then observed traveling to the Harrah's casino, where the vehicle traveled slowly through all the levels of the parking garage, and then parked in a spot on the first level of the parking garage, where it remained for approximately three minutes. The vehicle then continued to the Red Roof Inn, located at 3636 Northeast Randolph Road, Kansas City, Missouri, where it went slowly through the parking lot. The vehicle then drove to the Crossland Inn, 4301 N. Corrington Ave., Kansas City, Missouri, where it drove the parking lot slowly. The vehicle then proceeded to the Ameristar Casino, where it slowly drove through the parking garage. The Red Roof Inn and the Crossland had been specifically mentioned by Miller previously as places where the intended victim might be found.

As the vehicle was leaving the Ameristar Casino property, officers overheard Miller say something about going back toward the intended victim's house. As the vehicle neared the intended victim's house (taking the same route as had been taken earlier), a traffic stop was conducted, and Miller was arrested without incident at 7:58 p.m. At the time of his arrest, Miller had a folding Gerber pocket knife in his pocket. Also located inside the vehicle was a torn black t-shirt in the front passenger side door compartment; a torn black t-shirt with two holes in it; two baseball caps; and a Blackberry Bold cellular telephone. The black T- shirt and homemade masks had not been present when the vehicle was searched by law enforcement prior to sending the CW to meet Miller.

Subsequent to the arrest, the CW was debriefed about what events had just taken place. The CW advised that when he arrived at the storage unit, Miller took an old black t-shirt and started tearing it up. Miller handed his knife to the CW so that the CW could work on his own mask. Miller finished his first. Miller told the CW that Miller they would not need gloves. After they finished making their masks, Miller put on a dark blue shirt and his hernia belt. Miller said he was ready to go, and locked up the storage unit. Miller directed the CW to drive to the intended victim's house, and after they had passed the house, Miller told the CW that the intended victim was not home. Miller elaborated that there were two cars there, one of which he was familiar with and the other he was not. Miller then directed the CW to Harrah's Casino, where they drove the parking lot up and down. The CW advised that Miller was ready to rob the intended victim, and that if Miller found the intended victim's vehicle, that they would wait all night if they had to for the intended victim to come back to it. While at Harrah's, they stopped and parked for a moment. Miller told the CW that the intended victim probably would not have a pound of methamphetamine on him any longer, and that he would probably only have about four ounces of methamphetamine and some marijuana, in addition to a .38 pistol and possibly a second pistol. Miller then directed the CW to

3

go to the Red Roof Inn, followed by the Crossland, followed by the Ameristar Casino, all in an attempt to locate the intended victim. As they were leaving the Ameristar Casino, Miller told the CW they would go back to the intended victim's house again one more time, and that they could stop at a McDonalds to get some cheeseburgers while they waited on the intended victim to come home. The CW also recalled that at some point while they were driving around, Miller told the CW that if this worked out, he knew someone else who was selling about a pound of methamphetamine a day. When Miller realized they were being pulled over by the police, he became silent and did not say another word.

Miller was interviewed at the Kansas City, Missouri Police Department by SA Williams and Task Force Officer Dion Dundovich, between 10:07 p.m. and 11:15 p.m. Miller was provided with the Kansas City, Missouri Police Department Miranda Waiver form, which he read aloud and signed at 10:07 p.m. SA Williams also verbally asked Miller if he understood what he read, to which he said yes. Miller identified himself as Charles F. Miller, Jr., born February 12, 1959, social security account number 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. Miller stated that he had not used methamphetamine for approximately one month, except that he had snorted one "line" the previous night. Miller stated that he was looking for the intended victim (he identified the intended victim by name) because the intended victim owed Miller $500 and that the intended victim had also caused Miller to have relationship problems with Miller's girlfriend. Miller said that he wanted to find the intended victim and just talk to him to get the money back. Miller thought that the intended victim would be intimidated and just give Miller the money. If the intended victim did not have the money to provide to Miller, Miller would try to take something else in its place. When asked what he thought the intended victim would have that Miller could take, Miller replied with the question, "What do dealers have?" Miller then continued by saying that he thought the intended victim would have a nice laptop computer, along with four, five, or six ounces of methamphetamine. Miller said he had previously purchased a half-gram of methamphetamine from the intended victim, as well as two 8-balls (approximately seven grams total), which he purchased on one occasion in the Spring of 2011. Miller said he had kept one of the 8-balls (3.5 grams) for himself, and gave the other one to someone else for no profit. When asked about the torn black t-shirts that were found in the car that looked like masks, Miller stated that he wouldn't need the mask, but the person who was with him was nervous.

**4. Use of Factual Admissions and Relevant Conduct.** The defendant acknowledges, understands and agrees that the admissions contained in Paragraph 3 and other portions of this plea agreement will be used for the purpose of determining defendant's guilt and advisory sentencing range under the United States Sentencing Guidelines ("U.S.S.G."), including the calculation of the defendant's offense level in accordance with U.S.S.G. § 1B1.3(a)(2). The defendant acknowledges, understands and agrees that the conduct charged in any dismissed counts of the

indictment as well as all other uncharged related criminal activity may be considered as "relevant conduct" pursuant to U.S.S.G. § 1B1.3(a)(2) in calculating the offense level for the charges to which defendant is pleading guilty.

**5. Statutory Penalties.** The defendant understands that upon pleading guilty to the Indictment, the maximum penalty the Court may impose is not less than ten (10) years imprisonment, not more than life imprisonment and not more than a $10,000,000.00 fine; and that the Court shall impose not more than five (5) years of supervised release. The defendant further understands that this offense is a Class A felony.

The defendant also understands that for each count of conviction the Court shall impose a $100 mandatory special assessment which must be paid in full *prior* to sentencing in this case. Failure to *timely* pay said assessment can result in the Government seeking a continuance of the sentencing until it is paid OR, in the alternative, the Government can consider the failure to timely pay it as a violation of this plea agreement and seek to have this agreement voided.

**6. Sentencing Procedures.** The defendant acknowledges, understands and agrees to the following:

    a. in determining the appropriate sentence, the Court will consult and consider the United States Sentencing Guidelines promulgated by the United States Sentencing Commission; these Guidelines, however, are advisory in nature, and the Court may impose a sentence either less than or greater than the defendant's applicable Guidelines range, unless the sentence imposed is "unreasonable";

    b. the Court will determine the defendant's applicable Sentencing Guidelines range at the time of sentencing;

    c. in addition to a sentence of imprisonment, the Court shall impose a term of supervised release of not more than five (5) years;

    d. if the defendant violates a condition of supervised release, the Court may revoke that supervised release and impose an additional period of imprisonment without credit for time previously spent on supervised release. In

addition to a new term of imprisonment, the Court also may impose a new period of supervised release;

 e. the Court may impose any sentence authorized by law, including a sentence that is outside of, or departs from, the applicable Sentencing Guidelines range;

 f. any sentence of imprisonment imposed by the Court will not allow for parole;

 g. the Court is not bound by any recommendation regarding the sentence to be imposed or by any calculation or estimation of the Sentencing Guidelines range offered by the parties or the United States Probation Office;

 h. the defendant may not withdraw this guilty plea solely because of the nature or length of the sentence imposed by the Court;

**7.** **Government's Agreements.** Based upon evidence in its possession at this time, the United States Attorney's Office for the Western District of Missouri, as part of this plea agreement, agrees not to bring any additional charges against defendant for any federal criminal offenses related to the charges to which defendant has pled herein for which it has venue and which arose out of the defendant's conduct described above.

The defendant recognizes that the United States' agreement to forego prosecution of all of the criminal offenses with which the defendant might be charged is based solely on the promises made by the defendant in this agreement and the limitations set out herein. If the defendant breaches this plea agreement, the United States retains the right to proceed with the original charges and any other criminal violations established by the evidence. The defendant expressly waives any right to challenge the initiation of the dismissed or additional charges against defendant if defendant breaches this agreement. The defendant expressly waives any right to assert a statute of limitations defense if the dismissed or additional charges are initiated against defendant following a breach of this agreement. The defendant further understands and agrees

6

that if the Government elects to file additional charges against defendant following breach of this plea agreement, defendant will not be allowed to withdraw this guilty plea.

The defendant understands that this plea agreement does not foreclose any prosecution for an act of murder or attempted murder, an act or attempted act of physical or sexual violence, or a conspiracy to commit any such acts of violence. Nor does it foreclose prosecution for any criminal activity of which the United States Attorney for the Western District of Missouri has no knowledge. The defendant understands and agrees that if the Government files additional charges against defendant for one of these exceptions, defendant will not be allowed to withdraw this guilty plea.

**8. Preparation of Presentence Report.** The defendant understands the United States will provide to the Court and the United States Probation Office a government version of the offense conduct. This may include information concerning the background, character, and conduct of the defendant, including the entirety of defendant's criminal activities. The defendant understands these disclosures are not limited to the counts to which defendant has pleaded guilty.

The United States may respond to comments made or positions taken by the defendant, defendant's counsel or anyone on defendant's behalf and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject only to any limitations set forth in this plea agreement. The United States and the defendant expressly reserve the right to speak to the Court at the time of sentencing pursuant to Rule 32(i)(4) of the Federal Rules of Criminal Procedure.

**9. Withdrawal of Plea.** Either party reserves the right to withdraw from this plea agreement for any or no reason at any time prior to the entry of the defendant's plea of guilty and

7

its formal acceptance by the Court. In the event of such withdrawal, the parties will be restored to their pre-plea agreement positions to the fullest extent possible. However, after the plea has been formally accepted by the Court, the defendant may only withdraw these pleas of guilty if the Court rejects the plea agreement or if the defendant can show a fair and just reason for requesting the withdrawal. The defendant understands that if the Court accepts defendant's pleas of guilty and this plea agreement but subsequently imposes a sentence that is outside the defendant's applicable Sentencing Guidelines range, or imposes a sentence that the defendant does not expect, like or agree with, that will not permit defendant to withdraw these pleas of guilty.

10. **Agreed Guidelines Applications.** With respect to the application of the Sentencing Guidelines to this case, the parties stipulate and agree as follows:

    a. The Sentencing Guidelines do not bind the Court and are advisory in nature. The Court may impose a sentence that is either above or below the defendant's applicable Guidelines range, provided the sentence imposed is not "unreasonable";

    b. The applicable Guidelines section for the offense of conviction is U.S.S.G. § 2D1.1(4) and the parties agree it appears to call for a base level of 32;

    c. While the parties recognize there might be other specific aggravating or mitigating U.S.S.G. applications applicable to this defendant, the parties elect to address those at sentencing whether or not applied by the pre-sentence report or Court;

    d. The defendant appears to have admitted his guilt and accepted responsibility for his actions, and, by timely notifying authorities of the intention to enter a plea of guilty, has thereby permitted the Government to avoid preparing for trial and permitted the Government and the Court to allocate their resources efficiently. Therefore, the defendant appears entitled to a reduction for acceptance of responsibility pursuant to § 3E1.1(b) of the Sentencing Guidelines and the amount of the reduction will depend on the final guideline level set by the Court at sentencing. Should the Court determine the final guideline level to be 16 or above, the reduction for acceptance would be three levels but if the final determined level is below a level 16, the reduction would be two levels. The Government, at the time of sentencing, will make a motion with the Court to that effect unless the defendant (1) fails to abide by all of the terms and conditions of this plea agreement and any pretrial release orders; or (2) attempts to withdraw this guilty plea; or (3) violates the law; or (4) otherwise engages in conduct inconsistent with an acceptance of

responsibility;

 e. There is no agreement between the parties regarding the defendant's criminal history category. The parties agree that the Court will determine the applicable criminal history category after receipt of the presentence investigation report prepared by the United States Probation Office;

 f. The defendant understands that the estimate of the parties with respect to the Guidelines computation set forth in the subsections of this paragraph does <u>not</u> bind the Court or the United States Probation Office with respect to the appropriate Guidelines levels. Additionally, the failure of the Court to accept these stipulations will not, as outlined in Paragraph 9 of this plea agreement, provide the defendant with a basis to withdraw this plea of guilty;

 g. The United States agrees not to seek an upward departure from the ultimately determined Guideline range or a sentence outside the Guidelines range, and the defendant agrees to not seek a downward departure from the ultimately determined Guideline range or a sentence outside the Guidelines range. This agreement by the parties to not seek a sentence outside the ultimate Guideline range determined by the Court is not binding upon the Court or the United States Probation Office and the Court may impose any sentence authorized by law, including any sentence outside the applicable Guidelines range that is not "unreasonable";

 h. The defendant consents to judicial fact-finding by a preponderance of the evidence for all issues pertaining to the determination of the defendant's sentence, including the determination of any mandatory minimum sentence (including the facts that support any specific offense characteristic or other enhancement or adjustment), and any legally authorized increase above the normal statutory maximum. The defendant waives any right to a jury determination beyond a reasonable doubt of all facts used to determine and enhance the sentence imposed, and waives any right to have those facts alleged in the indictment. The defendant also agrees that the Court, in finding the facts relevant to the imposition of sentence, may consider any reliable information, including hearsay; and

 i. The defendant understands and agrees that the factual admissions contained in Paragraph 3 or other places within this plea agreement, and any admissions made during the defendant's plea colloquy, support the imposition of the agreed-upon Guidelines calculations contained in this agreement.

11. **<u>Effect of Non-Agreement on Guidelines Applications.</u>** The parties understand, acknowledge and agree that there are no agreements between the parties with respect to any Sentencing Guidelines issues other than those specifically listed in Paragraph 10, and its

9

Case 4:12-cr-00182-BP   Document 59   Filed 10/18/13   Page 9 of 15

subsections.   As to any other Guidelines issues, the parties are free to advocate their respective positions at the sentencing hearing.

    **12. <u>Change in Guidelines Prior to Sentencing</u>.**   The defendant agrees that if any applicable provision of the Guidelines changes after the execution of this plea agreement, then any request by defendant to be sentenced pursuant to the new Guidelines will make this plea agreement voidable by the United States at its option.   If the Government exercises its option to void the plea agreement, the United States may charge, reinstate, or otherwise pursue any and all criminal charges that could have been brought but for this plea agreement.

    **13. <u>Government's Reservation of Rights</u>.**   The defendant understands that the United States expressly reserves the right in this case to:

    a.   oppose or take issue with any position advanced by defendant, or anyone on behalf of the defendant, at the sentencing hearing which might be inconsistent with the provisions of this plea agreement;

    b.   comment on the evidence supporting the charges in the indictment;

    c.   oppose any arguments and requests for relief the defendant, or anyone on defendant's behalf, might advance on an authorized appeal from the sentences imposed and that the United States remains free on appeal or collateral proceedings to defend the legality and propriety of the sentence actually imposed, even if the Court chooses not to follow any recommendation made by the United States; and

    d.   oppose any post-conviction motions for reduction of sentence, or other relief.

    **14. <u>Waiver of Constitutional Rights</u>.**   The defendant, by pleading guilty, acknowledges that defendant has been advised of, understands, and knowingly and voluntarily waives the following rights:

    a.   the right to plead not guilty and to persist in a plea of not guilty;

    b.   the right to be presumed innocent until defendant's guilt has been established beyond a reasonable doubt at trial;

        c.   the right to a jury trial, and at that trial, the right to the effective assistance of counsel;

        d.   the right to confront and cross-examine the witnesses who testify against the defendant;

        e.   the right to compel or subpoena witnesses to appear on defendant's behalf; and

        f.   the right to remain silent at trial, in which case that silence may not be used against defendant.

The defendant understands that by pleading guilty, he waives or gives up those rights and that there will be no trial. The defendant further understands that if he pleads guilty, the Court may ask questions about the offense or offenses to which defendant pleaded guilty, and if the defendant answers those questions under oath and in the presence of counsel, those answers may later be used against defendant in a prosecution for perjury or making a false statement. The defendant also understands he has pleaded guilty to a felony offense and, as a result, will lose the right to possess a firearm or ammunition and might be deprived of other rights, such as the right to vote or register to vote, hold public office, or serve on a jury.

**15.** **Waiver of Appellate and Post-Conviction Rights.**

        a.   The defendant acknowledges, understands and agrees that by his *unconditional* plea of guilty pursuant to this plea agreement she waives the right to appeal or collaterally attack a finding of guilt following the acceptance of this plea agreement, except on grounds of (1) ineffective assistance of counsel; or (2) prosecutorial misconduct.

        b.   The defendant expressly waives the right to appeal any sentence, directly or collaterally, on any ground except claims of (1) ineffective assistance of counsel; (2) prosecutorial misconduct; or (3) an illegal sentence. An "illegal sentence" includes a sentence imposed in excess of the statutory maximum, but does *not* include less serious sentencing errors, such as a misapplication of the Sentencing Guidelines, an abuse of discretion, or the imposition of an unreasonable sentence. However, if the United States exercises its right to appeal the sentence imposed as authorized by 18 U.S.C. § 3742(b), the defendant is released from this

11

waiver and may, as part of the Government's appeal, cross-appeal the sentence as authorized by 18 U.S.C. § 3742(a) with respect to any issues that have not been stipulated to or agreed upon in this agreement.

16. **<u>Financial Obligations</u>.**

By entering into this plea agreement, the defendant states an understanding of and agrees to the following financial obligations:

    a. The United States may use the Federal Debt Collection Procedures Act and any other remedies provided by law to enforce any restitution order that may be entered as part of the sentence in this case and to collect any fine or costs.

    b. The defendant will fully and truthfully disclose all assets and property in which defendant has any interest, or over which the defendant exercises control directly or indirectly, including assets and property held by a spouse, nominee or other third party. The defendant's disclosure obligations are ongoing, and are in force from the execution of this agreement until the defendant has satisfied the restitution or fine or costs order in full.

    c. Within 10 days of the execution of this plea agreement, at the request of the USAO, the defendant agrees to execute and submit (1) a Tax Information Authorization form; (2) an Authorization to Release Information; (3) a completed financial disclosure statement; and (4) copies of financial information that the defendant submits to the U.S. Probation Office. The defendant understands that compliance with these requests will be taken into account when the United States makes a recommendation to the Court regarding the defendant's acceptance of responsibility.

    d. At the request of the USAO, the defendant agrees to undergo any polygraph examination the United States might choose to administer concerning the identification and recovery of substitute assets, restitution, fines, or costs.

    e. The defendant hereby authorizes the USAO to obtain a credit report pertaining to defendant to assist the USAO in evaluating the defendant's ability to satisfy any financial obligations imposed as part of the sentence.

    f. The defendant understands that a Special Assessment will be imposed as part of the sentence in this case. The defendant promises to pay the Special Assessment of **$100.00** by submitting a satisfactory form of payment to the Clerk of the Court prior to appearing for the sentencing proceeding in this case. The defendant agrees to provide the Clerk's receipt as evidence of fulfillment of this obligation at the time of sentencing.

g. The defendant certifies that no transfer of assets or property has been made for the purpose of (1) evading financial obligations created by this Agreement; (2) evading obligations that may be imposed by the Court; nor (3) hindering efforts of the USAO to enforce such financial obligations. Moreover, the defendant promises that no such transfers will be made in the future.

h. In the event the United States learns of any misrepresentation in the financial disclosure statement, or of any asset in which the defendant had an interest at the time of this plea agreement that is not disclosed in the financial disclosure statement, and in the event such misrepresentation or nondisclosure changes the estimated net worth of the defendant by ten thousand dollars ($10,000.00) or more, the United States may at its option: (1) choose to be relieved of its obligations under this plea agreement; or (2) let the plea agreement stand, collect the full forfeiture, restitution, and fines imposed by any criminal or civil judgment, and also collect 100% (one hundred percent) of the value of any previously undisclosed assets. The defendant agrees not to contest any collection of such assets. In the event the United States opts to be relieved of its obligations under this plea agreement, the defendant's previously entered pleas of guilty shall remain in effect and cannot be withdrawn.

17. **Waiver of FOIA Request.** The defendant waives any and all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case including, without limitation, any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act of 1974, 5 U.S.C. § 552a.

18. **Waiver of Claim for Attorney's Fees.** The defendant waives any and all claims under the Hyde Amendment, 18 U.S.C. § 3006A, for attorney's fees and other litigation expenses arising out of the investigation or prosecution of this matter.

19. **Remand Into Custody After Plea.** The defendant understands that, pursuant to 18 U.S.C. § 3143(a), the crime to which he is pleading is an offense for which the Court is required to detain the defendant after he pleads guilty.

20. **Defendant's Breach of Plea Agreement.** If the defendant commits any crimes, violates any conditions of release, or violates any term of this plea agreement between the signing

of this plea agreement and the date of sentencing, or fails to appear for sentencing, or if the defendant provides information to the Probation Office or the Court that is intentionally misleading, incomplete, or untruthful, or otherwise breaches this plea agreement, the United States will be released from its obligations under this agreement. The defendant, however, will remain bound by the terms of the agreement, and will not be allowed to withdraw this plea of guilty.

The defendant also understands and agrees that in the event this plea agreement is violated, all statements made by the defendant to law enforcement agents subsequent to the execution of this plea agreement, any testimony given by defendant before a grand jury or any tribunal or any leads from such statements or testimony shall be admissible against defendant in any and all criminal proceedings. The defendant waives any and all rights under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that pertains to the admissibility of any statements made by defendant subsequent to this plea agreement.

21. **Defendant's Representations.** The defendant acknowledges that he has entered into this plea agreement freely and voluntarily after receiving the effective assistance, advice and approval of counsel. The defendant acknowledges that he is satisfied with the assistance of counsel, and that counsel has fully advised him of his rights and obligations in connection with this plea agreement. The defendant further acknowledges that no threats or promises, other than the promises contained in this plea agreement, have been made by the United States, the Court, his attorneys or any other party to induce him to enter this plea of guilty.

22. **No Undisclosed Terms.** The United States and the defendant acknowledge and agree that the above-stated terms and conditions, together with any written supplemental agreement that might be presented to the Court in camera, constitute the entire plea agreement

between the parties, and that any other terms and conditions not expressly set forth in this agreement or any written supplemental agreement do not constitute any part of the parties' agreement and will not be enforceable against either party.

23. **Standard of Interpretation.** The parties agree that the constitutional implications inherent in plea agreements shall determine the interpretation and nature of the terms of this agreement.

Tammy Dickinson
United States Attorney

Dated: 08/28/2013   */s/ Charles E. Ambrose, Jr.*

Charles E. Ambrose, Jr.
Assistant United States Attorney

I have consulted with my attorney and fully understand all of my rights with respect to the offenses charged in the indictment. Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines and any statutory minimums. I have read this plea agreement and carefully reviewed every part of it with my attorney. I understand this plea agreement and I voluntarily agree to it.

Dated: 08/28/2013   */s/ Charles F. Miller, Jr.*

Charles F. Miller, Jr.
Defendant

I am defendant MARK OWEN's attorney. I have fully explained his rights with respect to the offenses charged in the indictment. Further, I have reviewed with the defendant the provisions of the Sentencing Guidelines and statutory minimum sentences which might apply in this case. I have carefully reviewed every part of this plea agreement with the defendant. To my knowledge and belief, the defendant's decision to enter into this plea agreement is an informed and voluntary one.

Dated: 08/28/2013   */s/ Stephen C. Moss*

Stephen C. Moss
Attorney for Defendant